UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                                        Case No. 19-CR-84-JDP

URSULA WING,                                 Madison, Wisconsin
                                             July 10, 2020
      Defendant.                       1:32 p.m.
_____

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

            Office of the United States Attorney
            BY:   DANIEL GRABER
            Assistant United States Attorney
            222 West Washington Avenue, Suite 700
            Madison, Wisconsin  53703

For the Defendant:

            Law Office of Christopher T. Van Wagner
            BY:   CHRISTOPHER T. VAN WAGNER
            110 East Main Street, Suite 705
            Madison, Wisconsin  53703

Also appearing:   URSULA WING, Defendant
                  JESSICA SHEETS, U.S. Probation Officer

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
 1              (Proceedings called to order at 1:32 p.m.)

 2              THE CLERK:  The United States District Court for the

 3     Western District of Wisconsin is now in session.  District Judge

 4     James D. Peterson presiding.

 5         Case No. 19-CR-84, the United States of America v. Ursula

 6     Wing, called for sentencing.

 7         May we have the appearances, please.

 8              MR. GRABER:  Good afternoon, Your Honor.  Dan Graber on

 9     behalf of the United States.

10              THE COURT:  Good afternoon.

11              MR. VAN WAGNER:  Good afternoon, everybody, including

12     the judge.  Ursula Wing appears by Zoom video.  She has muted

13     her microphone at my suggestion.  Chris Van Wagner appears with

14     her for sentencing today this way, and we consent to this.

15              THE COURT:  Very good.  Good afternoon to both of you.

16         I'll also note that Jessica Sheets, the probation officer

17     who prepared the presentence report, is also on the call with

18     us.

19         As Mr. Van Wagner indicated, we're proceeding by video

20     teleconference.  I think I got a written consent to this, but

21     I'm going to put it on the record as well.  I've made a

22     determination for the court as a whole that it's not safe to

23     hold in-person hearings without imposing an undue risk to the

24     safety of the participants, and I find that that's true in this

25     case in particular.  But we can proceed this way only if Ms.
```

1    Wing agrees to it.

2         So, Ms. Wing, I want to make sure you understand you've got

3    the right to appear before me in person for your sentencing.  Do

4    you understand that?

5              THE DEFENDANT:  Yes, I understand.

6              THE COURT:  And you're willing to waive your personal

7    appearance and proceed by video teleconference?

8              THE DEFENDANT:  Yes, I am.

9              THE COURT:  That's how we'll proceed then.

10        Here are the materials I've reviewed in connection with the

11   sentencing:  I've got the presentence report, statements that

12   there were no objections to the guideline calculations from both

13   sides, but both sides offered some factual clarifications, which

14   I believe are reflected in the addendum and the revised

15   presentence report, which I also have.  I've got the sentencing

16   memorandum in two chapters from Mr. Van Wagner on behalf of the

17   defendant.  I've got the government's response and then a

18   rejoinder from Mr. Van Wagner as well.  I've got the defendant's

19   written allocution and letters in support of Ms. Wing, and

20   thanks to those who took the time to write to me.  I appreciate

21   having the benefit of that input.

22        Let's make sure I didn't miss anything.  Mr. Graber,

23   anything else on your side?

24              MR. GRABER:  That covers it.

25              THE COURT:  And, Mr. Van Wagner, anything else on the

1    defense?

2              MR. VAN WAGNER:  No, Your Honor.

3              THE COURT:  All right.  Ms. Wing, I need to make sure

4    that you have reviewed the presentence report, the addendum and

5    the revised presentence report, and that you discussed those

6    documents with your lawyer.  Have you done that?

7              THE DEFENDANT:  Yes, I did.

8              THE COURT:  Do you have --

9         Let me ask this, Mr. Van Wagner, first:  Have the factual

10   clarifications that you proposed been adequately reflected in

11   the revised report?

12             MR. VAN WAGNER:  Yes, Your Honor.  Ms. Sheets has done

13   a very fine job with that.

14             THE COURT:  All right.  Very good.

15        Then I'll ask you, Ms. Wing, do you have any other concerns

16   with the presentence report?

17             THE DEFENDANT:  No, I don't.

18             THE COURT:  I will adopt the facts in the presentence

19   report as the facts on which I'll base my sentence.  I'll accept

20   the plea agreement.  The offense of conviction adequately

21   reflects the defendant's criminal conduct.  The plea agreement

22   does not undermine the statutory purposes of sentencing, and in

23   determining the defendant's sentence, I will take into

24   consideration the advisory sentencing guidelines and the

25   statutory purposes of sentencing that are set out in the

1    statutes at Title 18, United States Code, Section 3553(a).

2        There was an objection from the government on the financial

3    profile, but I believe that that has all been resolved and

4    corrected in the revised report.

5        Mr. Graber, do you agree with that?

6            MR. GRABER:  Correct, Your Honor.

7            THE COURT:  All right.  Because we're in agreement on

8    the guidelines, I've reviewed the calculation, and I find that

9    the revised report correctly calculates the guidelines.  So I'll

10   just ask us to confirm that we're all in agreement on where we

11   landed, and that is that we have a total offense level of 12,

12   criminal history category is I, which means that Ms. Wing has an

13   advisory guideline imprisonment range of ten to 16 months.

14       Mr. Graber, are we right about that?

15           MR. GRABER:  Agreed, Your Honor.

16           THE COURT:  And, Mr. Van Wagner?

17           MR. VAN WAGNER:  We also agree.

18           THE COURT:  All right.  That's where the guidelines

19   take us.  Let's find out then if the parties have further input

20   on what sentence I should impose.

21       Mr. Graber, I'll begin with you.

22           MR. GRABER:  Your Honor, I did file the written

23   sentencing memo, and I'll stand on that.  I would just -- with

24   regards to the defense rejoinder to that, I just want to clarify

25   the point I made in the sentencing memo with regards to the

1    numbers not being right the first time around.  There seems to
2    be an issue as to whether that was done intentionally or not.
3    From our position, Your Honor, everything that we saw was that
4    that was the case.  Now apparently they're coming back and
5    saying that wasn't the case and that probation may have not seen
6    the numbers.
7         My only point is if you look at Record No. 36, the letter
8    that was filed on June the 12th by the defense, that is their
9    position saying, yeah, that number was wrong, it's understated.
10   The asset now, even though it was part of the estate, it's now
11   her asset, and so, you know, the assets need to be increased by
12   that amount, and now she's got a net worth of 931 grand as
13   opposed to a negative 84 grand.  So that's where we were coming
14   from when I was making that argument in my sentencing
15   memorandum, that if it wasn't a problem before, then why send an
16   updated version of the numbers, and that was only after the
17   government pointed out, hey, wait a minute, you've got this
18   negative net worth, and you're not listing an asset that you --
19   you know, you're listing the liability but not the asset because
20   you're saying it's a number -- well, it's part of the estate's
21   assets.  It's not my assets yet.
22        And the other thing we had is it's simply them saying she's
23   only getting one half of it.  There's nothing -- there was
24   nothing submitted saying what the split was with the
25   inheritance.  It's my understanding, according to the PSR,

1    there's three kids, so there's her, there's Michael, and there's

2    Richard, and we don't have any records in terms of how that was

3    split or whether she's -- the records that were sent with Mr.

4    Van Wagner's latest filing here, 48-3, shows that the income

5    coming in from that rental property is 18 grand a month, the

6    mortgage is 3,500, so you've got a profit coming out on this

7    thing just based on that, so that's one thing I wanted to point

8    out.

9         The other thing is if -- we pointed out the liquid net

10   assets of 503,000, 504,000 to be able to pay that down.  If you

11   even cut that in half, it's 252 grand.  You take out the 62 for

12   the forfeiture, which we don't argue -- we're not arguing that's

13   punishment -- you've got 190, almost 200 grand in liquid assets,

14   and a $55,000 fine is just a fourth of that, Your Honor.  And so

15   it seems a bit rich to say, "Hey, you're taking away my

16   inheritance by hitting me with a fine that big," when the whole

17   point you went into this illegal activity in the first place was

18   to make money.  So that would be my argument as to why that

19   $55,000 number is the appropriate number.

20        THE COURT:  Well, just to be clear, Ms. Sheets was

21   pretty forthright in acknowledging that it was her overlooking

22   information that had been provided about the inheritance, or at

23   least the value of the real estate, and the inheritance was not

24   reflected in the original presentence report.  So it's hard to

25   really put the blame and infer that it was really deceptive at

1   the beginning.  Incorrect, yes, but Ms. Sheets has kind of owned

2   the overlooking of that, and as Mr. Van Wagner points out, there

3   were a lot of really detailed financial records that really were

4   supplied.  So whether she has the resources is a separate

5   question.  I just don't think that there was anything deceptive

6   about it on the first pass on the presentence report.  But I

7   understand your argument about the fine.

8         Anything else?

9             MR. GRABER:  No.

10            THE COURT:  All right.  Mr. Van Wagner, do you have

11  anything to add?

12            MR. VAN WAGNER:  This is the moment where I think maybe

13  I should just keep my mouth shut, Judge, but I do want to say

14  something --

15            THE COURT:  That's the risk you take.

16            MR. VAN WAGNER:  -- about the property.  That's really

17  hard to do, but Mr. Graber raised a point, and it's not relating

18  to whether the error was intentional or deceptive.  It relates

19  to the ownership.  In the 800 pages of linked documents that

20  were made available to Ms. Sheets, Mr. Graber, first of all, had

21  every right to inspect them and didn't.

22        Second, they included the will, the estate paperwork, all

23  of the real estate paperwork, and when those numbers were

24  submitted on that form in April, those numbers were still fluid

25  because there were -- the estate was closing.  So the updated

1    numbers are accurate.

2         I can't sit here and tell you, Judge, that Mr. Graber is

3    correct that if there's $18,000 in rent and $3,500 in mortgage,

4    that Ms. Wing is sharing one half or one-third of a profit of

5    $15,000 a month.  That's a simplistic way to make it sound like

6    she's making a lot of money, but if you have questions about her

7    current income, she'll answer them.  But we've tried to be

8    completely forthcoming, and I think the 800 pages of documents

9    are there if the U.S. Attorney's Office wanted to look at them.

10   I would say this:  Ms. Wing is certainly in a better financial

11   position with her father having left the inheritance and having

12   finished much of the estate work.  It's still moving, and that

13   certainly was always the case, but the numbers were clarified

14   with our submission.

15        This is what I do want to say:  Her income now is new, and

16   what I mean by that is she worked in two industries.  She worked

17   in information technology, and she's been out of that for a

18   while, and she's worked in construction.  The construction part

19   of her employ is new, and she's starting a business.  She

20   estimates that, like most businesses in a normal world, one

21   which we don't currently inhabit fully, it takes three to five

22   years to make a business go.  So she is bleeding thousands of

23   dollars a month literally out of the corpus of her inheritance

24   and her funds, and she's tried to keep that as low as possible.

25   The hope is to make the business a go.  Whether she ever gets

1    back into information technology or not is an unknown.

2         But as a practical matter, the money, while seemingly a

3    large number, does not make her rich, does not make her wealthy,

4    and certainly gives her the ability to deplete it to pay

5    whatever fine this court orders, but I don't think one at the

6    very top end of the range is merited here.  I think moderation

7    would be the key because, although it's not punishment, the

8    forfeiture itself does reflect more than just what was the

9    hundred percent markup or 50 percent profit on the revenues the

10   government tracked.  And so from that perspective it essentially

11   amounts to a punitive total, though certainly agreed and subject

12   to forfeiture, because it takes away the investment she made of

13   about $30,000 to obtain and set up and distribute pills

14   illegally.  So there's punishment.

15        I also want to -- something has been on my mind about

16   criminal prosecution in general, and this is where I want to

17   finish, Judge, and I really mean that.  What lies ahead for

18   Ursula is problematic in terms of her future income.  She's

19   smart, she's very hard working, she's industrious, she's

20   educated, and she's skilled, but in the two industries where she

21   pursues income, there are two major roadblocks that now arise

22   from her conviction.  One is the fact of the felony conviction,

23   which people will be readily able to find, and, second, it's

24   really not a surprise that in this day and age anybody who

25   wishes to employ you, whether it be as a contractor or an

1    employee, Googles you.  Well, we know what's going to come up,

2    that she's a convicted felon, that she was brought to court in

3    Wisconsin and was convicted of breaking the law in the ways we

4    have all agreed she did.

5        Those are hurdles whose measure are hard to take.  I know

6    Ursula is a survivor, and she'll work hard, but they're real,

7    and those, along with the situation resulting from the pandemic,

8    simply mean that while even in Madison, much less New York, that

9    sum is certainly comfortable, it's not a wealth, and the Court

10   should simply exhibit whatever quality of mercy it can in

11   mitigating the fine in light of her full acceptance of

12   responsibility, which I think I put in writing and stand behind.

13       And we didn't really want to get into a political

14   discussion.  We don't intend to.  That was never the point, but

15   I thought it was important, as did Ursula, that the Court

16   understand some of the backdrop that brought her here, and

17   that's why she gave you such a lengthy advance allocution

18   knowing, as she did, that that would give Mr. Graber a chance to

19   take a couple licks at it even before we walked in today, and he

20   did.  But that being said, she's told me to let you know that

21   she's prepared to answer any questions, but she would like to

22   rely upon that allocution.

23       Finally, I would be remiss if I did not finish by saying I

24   do commend Ms. Sheets and really appreciate the extra effort she

25   had to put in here to straighten things out.  And thank you,

1    Jessica.

2         That's all I have today, Judge.

3         THE COURT:  All right.  Thank you.

4         All right.  Ms. Wing, you've got the right to address the

5    Court before I decide what your sentence would be.  You don't

6    have any obligation to say anything else, but if you have

7    anything to add, I would like to hear it.  I did see that you

8    had some reaction to Mr. Graber's comment about your finances,

9    but the floor is yours.

10        THE DEFENDANT:  Well, I had not planned to make any

11   further statement beyond my written statement that was

12   previously filed, but I would like to point Mr. Graber and Chris

13   and yourself to the P&L statement that I submitted along with

14   the bank statements regarding the property.  I'm not sure where

15   Mr. Graber is getting those numbers, but it's all in the, you

16   know, 800-page link that I think everyone has access to the

17   login of, and, you know, last year it was a net loss.  I'm

18   hoping to improve that.  Just that point to clarify, and then

19   otherwise I think I'd like to just rely on my written statement.

20        THE COURT:  Well, if you would, just address the point

21   that Mr. Graber made.  Let me say this, by the way:  I don't

22   entertain any doubts about the fact that you share the real

23   estate and one of the accounts with your brother and that you

24   have only a half interest in that amount.  So that's -- Ms.

25   Sheets has that in the presentence report.  I don't have any

1   doubts about that.  But Mr. Graber makes the point that the real

2   estate produces $18,000 in rent against a mortgage of only

3   $3,500, so that leaves lots of income per month.  I don't know

4   if you are prepared to just explain that.

5           THE DEFENDANT:  Okay.  I'm not sure where that 18,000

6   is coming from because the rent roll is -- it's a little over

7   9,000.  Maybe he can tell me where that 18 comes from, and,

8   again, that's in the P&L statement and the bank statements.

9   And, you know, I pay a superintendent who works on it $880 per

10  month.  It depends on how many weeks in that month.  There's

11  also one to 2,000 worth of utility bills, so that's rolled into

12  the cost of rent.  We don't bill that individually, which is

13  also in the tenant leases that I submitted in the link to Ms.

14  Sheets.

15      So, you know, it produces -- you know, now we've gotten it

16  to a modest income.  Last year it was a net loss, and it's

17  improving, but, you know, the amount I'm able to pay myself from

18  what's left over is $1,500 per month, which is a small fraction

19  of my expenses here.  So, again, I would point you to the

20  documentation.  I think that's the best clarification.

21          THE COURT:  All right.  All right.  All right.

22  Anything else?

23          THE DEFENDANT:  No.  I think that's all.

24          THE COURT:  We haven't really talked about the offense

25  much, and you had a pretty full written allocution about it, so

1    I have your perspective on it.  I guess I wanted to clarify one

2    thing:  One of the reasons we're here really is the event that

3    triggered the investigation, as I understand it, was the event

4    of the person in Wisconsin who surreptitiously gave the dose of

5    the first drug to his girlfriend in an attempt apparently to end

6    her pregnancy.  And this is really a corollary issue to our case

7    here.  He's being prosecuted in the state, but my understanding

8    is that the first drug would trigger an abortion in maybe 40

9    percent of the cases, but it's highly effective when combined

10   with the second drug but that on its own it does trigger

11   abortion in a certain number of cases.

12             THE DEFENDANT:  Can I respond?

13             THE COURT:  Yeah.

14             THE DEFENDANT:  Oh.  So the numbers that I have read

15   are that Misoprostol alone, which is the second drug, has an 85

16   percent efficacy rate, and then when combined with Mifeprex

17   administered orally 24 to 72 hours earlier, that jumps up to 95

18   percent.  I don't know of anyone that administers only Mifeprex.

19   I don't have any efficacy information on that, but it's just not

20   done.

21             THE COURT:  Just based on my reading when I saw the

22   information and the issue that was raised with the sentencing

23   memo that what he had done couldn't possibly have produced the

24   outcome of the abortion in the woman who was carrying his child,

25   I had read during development when it was first used as a

1    single-dose drug, that it was effective maybe in 40 percent of

2    the cases.  It's really neither here nor there I think in terms

3    of our discussion, although I understand that there are many

4    people who hold the view that the treatment regime that's

5    required by the FDA is unduly rigorous and that the combination

6    of the drugs for a medication-induced abortion is safe and

7    should be more readily available.  But the crime more broadly is

8    selling a drug that is not approved by the FDA, and that does

9    entail some risks.  One of the risks is that a person like

10   Mr. -- Schmidt [verbatim] I guess is his name -- would make an

11   unauthorized use of the drug because the distribution in the

12   manner that you distributed it is relatively uncontrolled, and

13   so somebody could do some malfeasance with it.

14        The second concern is that, and you shared this concern

15   because the testing regime that you had was simply to try out

16   the drugs on yourself before you sold them, but that that is

17   certainly not what we would expect as the standard for drugs

18   that are distributed to the public and that it was an effort on

19   your part to mitigate the risk that you were distributing drugs

20   from a source that you didn't know well but that that did impose

21   some risk on the public because, as you said, you weren't really

22   prepared or equipped to do the kind of testing that would

23   normally be done before a drug is sold to the public.  So even

24   apart from the understandable objection to the legal regime, the

25   fact that you distributed the unregulated and untested

1  medication to the public is of concern.

2       I'll take your response if you have one on that point.

3       THE DEFENDANT:  Okay.  Yeah, I acknowledge that those

4  are risks, and I don't think there's ever a point I felt that

5  they should not be regulated.  Like, I think they should.  I

6  think every shipment that comes into the U.S. should have a

7  random sample tested and, ideally, the test results published

8  before distribution.  I'm not sure if that happens with all

9  sources approved or unapproved.  But, no, I acknowledge that,

10  and I don't think -- I think it's a burden on women.  The

11  uncertainty of where you're getting it causes an enormous amount

12  of stress, so I'm in agreement that these things should be

13  tested and regulated.  I think women should have access to

14  regulated, tested medicine.

15       THE COURT:  And let me ask you straight out the

16  question that I think is posed by the sentencing submissions

17  that I have here:  Are you going to do this again?  Are you

18  sufficiently deterred?

19       THE DEFENDANT:  No, I'm not doing it again.

20       THE COURT:  I mean, I take it as a serious question

21  because I believe you're resolute in your view that you provided

22  a valuable component of health care to women who needed it.

23       THE DEFENDANT:  Well, you know, there are certain

24  political views that I hold.  I think there's a big difference

25  between disagreeing with a policy or feeling that maybe our

1    system does not adequately serve certain constituents,

2    especially the poor, and acting on those things.  You know,

3    ultimately this hasn't been worth it.  This has been really

4    stressful.  That's all.

5        THE COURT:  All right.  All right.  Here's what I'm

6    going to do with the sentence:  Neither side has asked for a

7    term of incarceration, and I don't think that would be necessary

8    here.  The factors that I have to consider in setting a sentence

9    include punishment, and there are times when incarceration is

10   warranted.  Even though there are many collateral consequences

11   to a felony conviction, sometimes that's just not enough

12   punishment.  But here I think that there's really no factor that

13   compels me to impose a term of incarceration on Ms. Wing.  The

14   only one I think that could arguably -- I guess there's two:

15   One, there's not enough punishment involved if I don't send her

16   to prison or, two, that she's not sufficiently deterred.

17       I'm persuaded that she's deterred from future conduct.

18   When I look at what has happened to her, there's a financial

19   component to the sentence that I impose; there's the collateral

20   consequence of a felony conviction, which is punitive; and

21   there's the stress of the prosecution.  And I acknowledge that

22   in many cases, I mean, that's sort of a baseline of what happens

23   when there's a felony prosecution, and in some cases even that

24   isn't enough in terms of punishment or really deterrence.  But

25   I'm persuaded that the prosecution itself with its corollary

1    effects is sufficiently punitive, and I'm persuaded that it's

2    very unlikely that Ms. Wing is going to reoffend.  I'll note too

3    that she has no other criminal history.  So in terms of that

4    component of the sentence, I don't think there's any need to

5    impose any term of incarceration.

6         Mr. Graber raised the issue of what effect I should give to

7    the fact that Ms. Wing is a single mom.  That too wouldn't

8    immunize her from a term of incarceration or from any other

9    punishment, but it is a factor, I think, probably in every

10   sentence.  I have many people who go to prison despite the

11   impact that it will have on their children, so it's not an

12   inconsiderable issue as far as I'm concerned, but it's not the

13   reason that I'm not sending Ms. Wing to prison.

14        And so I will impose a term of probation of two years, and

15   that will be subject to the conditions -- most of the conditions

16   that are proposed and justified in the presentence report.  I am

17   not inclined to impose the drug testing provision.  That's

18   normally a term of probation, but I see no meaningful substance

19   abuse history with Ms. Wing, and so particularly under the

20   current circumstances with the coronavirus, it just seems to me

21   to be really unnecessary kind of in the first place to impose a

22   drug testing requirement, but given the complexities of

23   administering a drug testing regime under coronavirus

24   conditions, it seems to be a real unnecessary waste of

25   resources.

1      So other than Condition No. 15, which is the drug testing

2   requirement, Mr. Van Wagner, do you have any objections in the

3   conditions that are proposed?

4           MR. VAN WAGNER:  (Inaudible).

5           THE COURT:  I'm reading your lips and guessing that

6   you're saying no, but let's confirm that.

7           MR. VAN WAGNER:  Thank you.  No, we have no objections.

8   I reviewed them with my client, and we have nothing to add to

9   that.

10          THE COURT:  All right.  And do you want me to read them

11   or do you need any further justification?

12          MR. VAN WAGNER:  We don't need further justification.

13   We do not require the Court to read them aloud.  We've had the

14   opportunity to review them in two versions of the presentence

15   report.  Ursula knows what they are, and she can affirm that

16   with a nod of the head if she likes.

17          THE COURT:  Okay.  All right.  So I won't read the

18   conditions.  It's tedious.  It's more effective, I think, to go

19   over them in writing anyway.  So the only thing I'll say is they

20   can be adjusted during the term of your probation if for some

21   reason they need to be adjusted to your circumstances.  You can

22   make a motion to the Court to revise the conditions.  You could

23   also -- the government or the probation office can do the same

24   thing.  So those conditions can be changed, but those conditions

25   1 through 14 will govern your conduct in addition to the

1    mandatory conditions, which are that you shouldn't commit any
2    more crimes, don't use controlled substances, provide a DNA
3    sample.  So those are the conditions.
4        I have already signed the order of forfeiture on the
5    property that was forfeited, and then I don't know if the order
6    that I signed included the $61,753 forfeiture, which was the
7    proceeds of the sale of the unlicensed medication.  And I want
8    to make an observation about it, and I think strictly speaking
9    it's not really punitive in the nature of being strictly a fine,
10   but I do recognize it has a punitive aspect to it here because
11   it's the forfeiture not just of the proceeds of the sale but
12   also the money that you spent to get the proceeds, and it's not
13   in the nature of restitution in a tax case where you're just
14   paying the amount that you owed anyway.  So I do think that the
15   $61,000 forfeiture actually has a punitive aspect to it, and so
16   as I calculate what additional fine should be appropriate,
17   that's a factor that I'm considering as well.
18       I think that in light of your circumstances, I can't find
19   that you're indigent and incapable of paying a fine, and so I'm
20   obligated to, under those circumstances, impose a just fine.  I
21   don't think that a fine at the top end of the guideline range is
22   really necessary for punishment, so the fine that I will impose
23   will be $10,000, near the low end of the guideline range.  And I
24   recognize that under your circumstances, I think if we thought
25   about a global scale, you're a wealthy person, but I don't think

1    that you're really what I would think of as a wealthy person as

2    I consider the fine to impose on you.  I think that you're

3    capable of living what many Americans would consider to be a

4    comfortable lifestyle, but I don't think that you have a large

5    amount of excess cash given the living expenses that you have

6    and the expenses of taking care of your daughter.  So I don't

7    really think of you as a wealthy person, but I do think that you

8    can afford a $10,000 fine, and I think that in conjunction with

9    the punitive dimension of the financial forfeiture that you're

10   making, that provides sufficient punishment, and so that's the

11   fine that I will order.

12        I also have to impose the $100 special assessment, which is

13   a requirement of any felony conviction, so I impose the $100

14   special assessment.

15        Let's see if there's anything else that I have to recognize

16   here in the sentencing.  I covered the forfeiture amount.

17        And I believe that, based on the correspondence that I have

18   from Mr. Van Wagner yesterday, I think the wire transfer has

19   been initiated.  I don't know -- I haven't gotten anything from

20   the clerk's office saying that they've received the $61,000 yet,

21   but I did see that the wire transfer was initiated, so I gather

22   that is in process.

23        The fine is due and payable immediately, and I will waive

24   interest as long as the fine is paid within 30 days of today's

25   sentencing.

1    There is no term of incarceration, so I don't know if the

2    probation office has to notify any law enforcement agencies and

3    the state attorney general of defendant's release to the

4    community.  She's not been incarcerated.

5    There was an appeal waiver on the -- on the -- in the plea

6    agreement, and so, Ms. Wing, you've waived your right to appeal.

7    If you believe that there's some residual right to appeal

8    because you think your plea somehow was unlawful or involuntary,

9    you have to file a notice of appeal within the deadlines, and

10   that means within 14 days of entry of judgment in this case or

11   within 14 days of any notice of appeal that would be filed by

12   the government if the government were to appeal.  If you can't

13   afford the filing fee for the appeal, you can apply for leave to

14   appeal *in forma pauperis*, which means without paying the filing

15   fee, and if you can't afford an attorney to represent you in the

16   appeal, you could apply for court-appointed counsel to represent

17   you at government expense.

18   I believe that we've got Count 2 to be dismissed; is that

19   right, Mr. Graber?

20   MR. GRABER:  Yes.  That's correct.

21   THE COURT:  Okay.  Count 2 is dismissed then.

22   I think I have covered everything that I need to address in

23   the sentence, but let's just make sure.

24   Mr. Graber, is there anything else I need to address?

25   MR. GRABER:  No, Your Honor.  I just want to make sure

1    you've announced the forfeiture of the money judgment in the

2    amount of $61,753, which I agree the wire has been made.  It

3    should be hitting shortly.  And you also signed the order this

4    morning with regards to the forfeiture of the Apple iPhone and

5    the Apple MacBook Pro, and so those would be forfeited as well.

6         THE COURT:  That's right.  And I did sign the order on

7    the MacBook and the iPhone.

8         MR. GRABER:  That's all I have, Your Honor.

9         THE COURT:  Mr. Van Wagner, anything else?

10        MR. VAN WAGNER:  No, Your Honor, other than

11   appreciative of the fact that we could do this using the Zoom

12   platform.

13        THE COURT:  Well, it's very efficient.  I kind of

14   prefer doing them in person.  It seems appropriate given the

15   dignity of the event to have everyone convene in the courtroom,

16   but under the circumstances it's safer to do it this way, and

17   it's quite efficient, so I'm happy to do it that way.

18       Ms. Sheets, is there anything that I overlooked?

19        OFFICER SHEETS:  Your Honor, I was -- just for

20   clarity's sake, are you waiving mandatory drug testing as well?

21        THE COURT:  Yes.  I am waiving mandatory drug testing.

22        OFFICER SHEETS:  Okay.  Thank you.

23        THE COURT:  All right.  Thank you, all.

24        MR. VAN WAGNER:  Thank you.  Have a good weekend.

25        THE CLERK:  This Honorable Court is adjourned.

1          (Proceedings concluded at 2:06 p.m.)

2                              ***

3          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

4     Reporter in and for the State of Wisconsin, certify that the

5     foregoing is a true and accurate record of the proceedings held

6     on the 10th day of July, 2020, before the Honorable

7     James D. Peterson, Chief U.S. District Judge for the Western

8     District of Wisconsin, in my presence and reduced to writing in

9     accordance with my stenographic notes made at said time and

10    place.

11         Dated this 18th day of August, 2020.

12

13

14

15

16

17                         _____/s/ Jennifer L. Dobbratz_____

18                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                    Federal Court Reporter
19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.